IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 1, 2016


**TORIAN DILLARD v. STATE OF TENNESSEE**


**Appeal from the Criminal Court for Shelby County**
**No. 03-02933      Glenn Wright, Judge**

---

**No. W2015-00579-CCA-R3-PC  -  Filed August 10, 2016**

---

The petitioner, Torian Dillard, was convicted in 2006 of aggravated kidnapping and sentenced to twenty years.  His conviction was affirmed on direct appeal.  State v. Torian Dillard, No. W2007-00911-CCA-R3-CD, 2008 WL 3342952, at *1 (Tenn. Crim. App. Aug. 11, 2008), perm. app. denied (Tenn. Feb. 2, 2009).  He then filed a timely petition for post-conviction relief, alleging that trial counsel had been ineffective in that counsel failed to properly investigate the facts of the case or to provide a sufficient reason to dismiss a prospective juror and that the trial court erred in allowing the victim to sit facing the jury, with her back to the petitioner.  After an evidentiary hearing, the post-conviction court denied relief; and, following our review, we affirm  that order.


**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Sean H. Muizers (on appeal); Larry Copeland and Cornelius Bostick (at hearing), Memphis, Tennessee, for the appellant, Torian Dillard.

Herbert H. Slatery III, Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Carla L. Taylor, Assistant District Attorney General, for the appellee, State of Tennessee.


**OPINION**

The petitioner has twice been convicted of crimes of violence against his former girlfriend, Carla Taylor.  First, he was convicted of her aggravated kidnapping, occurring on November 4, 2002, and resulting in a twenty-year sentence as a Range II, violent offender.  Id.  Subsequently, he shot her on February 10, 2003, resulting in convictions

for attempted first degree murder, reckless endangerment with a deadly weapon, and being a convicted felon in possession of a handgun and was sentenced to an effective sentence of fifty-two years. State v. Torian Dillard, No. W2005-00152-CCA-R3-CD, 2006 WL 1044087, at *1 (Tenn. Crim. App. Apr. 19, 2006), perm. app. denied (Tenn. Sept. 5, 2006). This appeal reviews the denial of his post-conviction petition for the 2002 offense.

The opinion of this court affirming the petitioner's aggravated kidnapping conviction set out the evidence presented by the State:

**State's Proof**

Memphis Police Officer Timothy Barnes testified that on November 4, 2002, he responded to an armed party call at a gas station on South Parkway. When he arrived at the gas station, he saw the defendant sitting in the passenger's side seat of a green Grand Am automobile. He drew his weapon and instructed the defendant to raise his hands and step out of the car. He patted down the defendant and detained him in the back of his car while he interviewed the victim. Officer Barnes spoke with the victim, Carla Taylor, who appeared upset and told him the defendant had a gun, had threatened her, and would not allow her or the other passenger, Kimberly White, to leave the car. He also spoke to White, who told him that the defendant had a gun and had threatened her. Officer Barnes searched the car and found a loaded nine-millimeter handgun underneath the passenger's seat. The defendant was placed under arrest.

Memphis Police Officer Michael Rosario testified that on November 7, 2002, he responded to a kidnapping call at the Goodwill Village Apartments. He spoke with the victim's sister, Shaneka Taylor, who appeared "[v]ery distraught" and "nervous" and told him that the victim had been kidnapped by her boyfriend, the defendant. Taylor said that the defendant had been walking back and forth to the front and rear of her apartment with his hand under his shirt, as if he were carrying a weapon. Officer Rosario also spoke with Kimberly White, who provided a similar account of the events. On cross-examination, he testified that White and Shaneka Taylor did not tell him they saw the defendant carrying a weapon.

Kimberly White testified that she had been friends with the victim for approximately ten years. She met the victim on November 4, 2002, to go shopping. On the way to the store, the defendant called the victim and asked her to pick him up. She agreed and drove to his apartment. After the

2

defendant got into the car, he asked White if she was a "whore" and began arguing with the victim. This made White uncomfortable, and she asked to be let out of the car at a gas station. At the gas station, the victim got out to pay for the gas while White remained in the car with the defendant and used her cell phone to call for a ride home. The victim returned to the car, pumped the gas, and then went back inside the store. The defendant followed her and then quickly returned to the car. Several minutes later the police arrived, and the defendant asked White if she had called the police. White replied in the negative, exited the car, and walked into the store, where the victim told her she had called the police because she had seen the defendant with a gun. White said that, when the defendant was placed in the patrol car, he called the victim and asked her why she had called the police on him. The victim handed the phone to White, and the defendant told her that he had just been released from jail and asked her to "take the charge for the gun" so he would not go back to jail. Over the next several days, the defendant repeatedly called the victim, asking her to call his family and help get him out of jail. He also called White's house asking if the victim was there.

On November 7, 2002, White accompanied the victim as she drove to Wal-Mart. The victim received a call from the defendant, who told her by which objects she was passing and on which streets she was driving. When they arrived at Wal-Mart, the victim refused to exit the car because she believed the defendant was following her. They drove back to the Goodwill Village Apartments, where White and Shaneka Taylor lived. Although the victim was staying with her sister, she parked her car in another part of the complex, closer to White's building, to try to hide her car. White went alone to her apartment and received a phone call from her neighbor, asking her to inform the victim that the defendant was outside. White did so, then looked out her window and saw the defendant in the victim's car, pulling items from the glove compartment and looking in the backseat and trunk. The victim went to her car and confronted the defendant. White heard the defendant tell the victim to get the keys to her car from White. The defendant and the victim came to White's apartment and knocked on the door, but White refused to open it. The defendant and the victim returned to the parking lot, got into a car, and left. White called the victim's cell phone and asked if she wanted her to call the police. The victim responded in the affirmative. White asked the victim where she was going, and she responded that she did not know. The victim told White that the defendant and his mother were in the car with her. White heard the victim ask the defendant's mother to let her out of the car, but the defendant

3

instructed his mother to keep driving. The phone disconnected, and White called the police.

On cross-examination, White testified that the victim got into the front seat of the two-door car, then moved her seat forward to allow the defendant to enter the backseat. She acknowledged that she gave a statement to the police that the defendant pushed the victim into the backseat and that she previously had been convicted of theft.

Memphis Police Lieutenant Donald Crowe testified that he was the felony response officer assigned to investigate the victim's kidnapping. He took a statement from Kimberly White, then sent patrol officers to the defendant's mother's house to attempt to locate the defendant and the victim. The officers did not locate either but found the victim's cell phone and purse in the defendant's mother's car. Lieutenant Crowe and his team of three detectives drove to the defendant's father's residence in the New Salem Manor Apartments, arriving around 3:00 a.m. They knocked on the front door but received no response. Lieutenant Crowe moved to the rear of the building, looked through a window, and saw the defendant and the victim lying in bed. He knocked on the back window, and the two woke up and walked from the bedroom into the hallway without answering. He called the defendant's cell phone but received no response.

Lieutenant Crowe became concerned because the defendant was aware that the police were present but refused to speak with them. After two hours of knocking on the doors, he declared a hostage situation, called in a tactical unit and hostage negotiators, and evacuated neighboring apartments. At approximately 6:40 a.m., the door to the defendant's father's apartment opened and the victim stumbled out. Thereafter, the hostage negotiators convinced the defendant to leave the apartment. Lieutenant Crowe testified that after the victim left the apartment she was "very withdrawn" and "[v]ery quiet." He opined that she minimized the events of that night and the actions of the defendant in the statement she subsequently gave him. He said these behaviors were common in victims of domestic violence.

On cross-examination, Lieutenant Crowe testified that he never saw the defendant or the victim between the time they awoke and left the bedroom and the time the victim left the apartment. He acknowledged that the victim told the police that she went back to sleep after being awakened by them. He testified, however, that he did not believe this statement

4

because the officers were constantly making noise and attempting to communicate with her and the defendant.

The victim testified that she ended her relationship with the defendant shortly before this offense. She stated that on November 4, 2002, she was driving with Kimberly White when the defendant called and asked her for a ride to his mother's house. She picked him up, and he got into the front passenger seat, turned to White, and asked if she was a "whore." The defendant began arguing with the victim and told her to make White leave the car. She pulled into a gas station, went inside the store, and asked the cashier to call the police because she was afraid of the defendant. The defendant came into the store and told her, "It's fixing to end." The police then arrived and arrested the defendant.

After the defendant went to jail, the victim stayed with her sister, Shaneka. She received numerous phone calls from the defendant over the next several days. The defendant asked why she wanted to leave him and told her that he was following her and could see her. The victim testified that these phone calls made her "uncomfortable" and "scared." On November 7, 2002, she returned to her apartment complex with Kimberly White and attempted to hide her car in the parking lot. The victim later received a call from White that the defendant had opened the trunk of her car. She went outside, and the defendant approached her and tried to make her leave with him. He kept his hands in his pockets while speaking to her, causing her to believe he had a gun. The two went to White's apartment and the defendant knocked on the door, asking for the keys to the victim's car. When White refused to answer the door, the defendant continued to attempt to convince the victim to leave with him and began "nudging" her toward a car driven by his mother. She got into the front seat, and the defendant got into the back seat.

While the defendant's mother, Brenda Love, was driving, the victim received a call from Kimberly White. She responded affirmatively when White asked if she should call the police. The victim asked to be let out of the car and, as the defendant's mother prepared to pull over to let her out, the defendant began "messing with" the keys and the gear shift. The defendant asked Love to tell the victim about his having shot through his ex-girlfriend's bedroom window and then said, "I'm fixing to kill this bitch."

Love stopped the car at the defendant's father's house. The defendant exited the car and instructed the victim to follow him. She initially refused because she feared that he was carrying a gun. However, he allowed her to search him for weapons, and when she found that he was not carrying one, she accompanied him into the apartment. She stated that she left her cell phone and purse in Love's car because she was scared and "[d]idn't want him going through it." When they entered the apartment, they talked and later went to sleep. The victim and the defendant were awakened by the police knocking at the window. They got out of bed and went into the hallway, where the victim told the defendant she intended to leave. He instructed her not to open the door because the police would come inside and kill him. She remained in the apartment until the next morning, when she told the defendant she needed to leave to pick up her children. She went to the door and the defendant pushed her outside and closed the door behind her.

On cross-examination, the victim acknowledged that she told the police she intended to talk with the defendant that day and thought that she, the defendant, and Love were going to Love's house to talk. She stated that when she got into Love's car, she told her she wanted to go. She testified that when they entered the defendant's father's apartment, the defendant went to the back of the apartment and left her up front. However, she denied that he took a bath while she was up front and said that he was only in the back for "probably a minute." She said she "probably could have tried" to leave while the defendant was in the back but was hesitant to do so because she was uncertain what the defendant would do.

The victim acknowledged that she had consensual sex with the defendant more than once while at his father's apartment. She stated that during and after they had sex, she wanted to be at the apartment with the defendant because they "had made up." She testified that she left the apartment of her own free will and that the defendant's father did not prevent her from leaving. She further acknowledged that she visited the defendant "[a] couple" of times after he was arrested for this offense and refused to show up for a preliminary hearing in this case because she did not want the prosecution to go forward. She denied that she and the defendant moved in together after this offense but acknowledged that they had spent three or four nights together.

6

**Defense Proof**

Brenda Love, the defendant's mother, testified that she was interviewed by Detective Carson while the defendant and victim were missing. She said that on November 7, 2002, she picked up the defendant around 6:30 p.m. and drove him to her house. She then went to visit her mother, and when she returned home, she found the defendant standing in the street. She picked him up, and he asked her to drive him to north Memphis. En route, the defendant called the victim. Love and the defendant arrived at an apartment complex, and the defendant instructed her to pull to the side and wait for him. Love saw the defendant standing in the doorway of the apartment complex and speaking to some young women, including Shaneka Taylor. Eventually, the defendant and the women parted ways, and one of the women told Love, "[Y]ou need to take your son back home before he goes back to jail." Love drove across the parking lot and saw the defendant and the victim talking. The victim then went to an upstairs apartment, came back downstairs, and walked to Love's car. Love asked the victim if she would like to sit in her car, and she did so. They talked and the defendant subsequently joined them and sat in the backseat. Love asked the victim if she was going with them, and she replied yes.

Love then drove to the defendant's father's apartment. She testified that the victim never used her cell phone during the drive. When they arrived, the defendant and the victim got out of the car, and the victim patted down the defendant. Love testified that they were laughing and playing around. After a short time, the defendant motioned to Love that she could leave, and she drove home. Later, the police arrived at her home and asked if the defendant and victim were present. Love told them that she had taken them to the defendant's father's apartment. She attempted to call the defendant, his father, and the victim but could not reach them. She told the police that the victim had left her cell phone and purse in her car and offered to take the police to the defendant's father's apartment. Instead, the police brought her to the police station and questioned her.

On cross-examination, Love testified that on the day of the offense, she would not let the defendant use her car and told her father that she was concerned about what the defendant might do. She denied that, during the drive to the defendant's father's apartment, the victim asked to be let of the car or that the defendant "messed with" the gear shift. She testified that while she was at the police station waiting to be interviewed, Detective Carson received a phone call informing her that the defendant and the

7

victim had been found and were not responding to the police. She denied, however, that upon hearing this news she fell to the floor and said, "[O]h, my God. He's killed her and he's killed himself."

Former Memphis Police Officer Monica Carson testified that she interviewed Brenda Love on the morning of November 8, 2002. She asked Love where the defendant and the victim were, and Love replied that she did not know. At one point, Love was sitting on a bench when Carson received a phone call informing her that the defendant and victim had been located but would not respond to knocks at the door and window. Carson testified that Love overheard this and "stood up and started being dramatic and, oh, Jesus, oh my God, oh my God, fell out on the floor. What did he do. What did he do." Carson stated that Love said, "[H]e must have killed them. He's dead. He's dead. Oh my God." Carson testified that Love subsequently changed her story and told her that she knew the defendant had the victim with him and that she thought the victim was afraid.

Torian Dillard, 2008 WL 3342952, at *1-5 (footnote omitted).

At the evidentiary hearing on the petition for post-conviction relief, the petitioner and trial counsel both testified. The petitioner said that trial counsel met with him regarding discovery materials "[m]aybe four" times, and counsel never conveyed a guilty plea offer from the State. The only potential witnesses counsel interviewed were the petitioner's mother and father, and counsel did not discuss with him any others. If his father had been called to testify at the trial, he would have said that he "told the victim not to leave the house because he had a warrant on him, not me." According to the petitioner, the State did not present proof that he had told the victim not to leave the house. Although the petitioner's father was present at the trial, counsel did not call him as a witness.

The petitioner said that trial counsel had failed to object to the jury's learning of his previous arrest for unlawful possession of a weapon. During the trial, testimony regarding this arrest was presented by Officer Timothy Barnes, Kimberly White, and the victim. The petitioner testified that the charges regarding this weapon had been dismissed before the trial which was the basis for his claim for post-conviction relief.

Additionally, the petitioner said that trial counsel had been ineffective in his responding to the testimony of the victim. According to the petitioner, trial counsel had failed to "notice, challenge, and/or object to the victim['s] . . . back being turned to

8

petitioner" in violation to his right to confrontation. According to the petitioner, the victim was allowed to sit "adjacent to the jury box," with her back turned to him. He said that the prosecutor walked between the petitioner and the victim so that the petitioner could not see her and she could not see him as she was testifying. The petitioner further said that this seating arrangement violated his right to due process and to a fair trial, but trial counsel did not make either of these arguments at the trial or in the motion for new trial.

Trial counsel testified that, at the time of the petitioner's trial, he had been practicing law for five years and that in the years since the trial, he had become capital case qualified. He said that the petitioner's parents had been indicted with him and did not testify at the trial because their attorneys had advised against it. When the charges against the petitioner were first tried, the result was a hung jury, but he was convicted following the second trial. As for the seating arrangement of the victim during her testimony, counsel said he objected to it. However, before the victim was moved from the witness stand, she was "about to break down in tears and said I can't do this." Counsel said that he argued that reseating the victim violated the petitioner's right to confrontation and that he repeated this claim in the motion for new trial.

## ANALYSIS

Without identifying or presenting the testimony of witnesses he feels might have aided his defense, the petitioner argues that trial counsel interviewed no potential witnesses other than the petitioner's parents, resulting in "deficient preparation" for the trial. Additionally, he argues that trial counsel erred by not objecting to Rule 404(b) evidence regarding a prior confrontation the petitioner had with the victim, as well as to the victim's testifying "with her back turned towards him," and not requesting curative instructions for this seating arrangement or ensuring a clear appellate record regarding it. Further, trial counsel was defective, in the petitioner's view, by not providing a successful challenge regarding a white prospective juror. As to these claims, the State responds either that they were previously determined on direct appeal or that the petitioner failed to prove that trial counsel was ineffective or he was prejudiced thereby. We will review the claims.

### I. Deficient Pretrial Preparation

The petitioner argues that trial counsel was ineffective for not properly investigating the case or interviewing potential witnesses other than the petitioner's parents. As to this claim, the post-conviction court found that the petitioner had failed to show that he was prejudiced by the fact that trial counsel had not interviewed the State's witnesses prior to the trial:

This Court finds that the law and ethical rules required a reasonable investigation which was not conducted. However, this was the second trial involving this case as the first one ended in a deadlocked jury. This meant that trial counsel had the benefit of the prior testimony to prepare for trial. Therefore, the petitioner has failed to prove with a reasonable probability that a proper investigation in this case would have resulted in a different outcome.

The petitioner neither presented at the evidentiary hearing other witnesses who would have aided his defense nor established how trial counsel's pretrial interviewing of the State's witnesses would have altered the outcome of the trial. In order to succeed on a claim that counsel did not properly investigate or call favorable witnesses, a petitioner must generally elicit favorable testimony from those witnesses at the evidentiary hearing, as a post-conviction court may not speculate "on the question of . . . what a witness's testimony might have been if introduced" at trial. Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Further, since the first trial of this matter ended in a hung jury, defense counsel already was aware of the State's proof. Accordingly, we agree with the post-conviction court that this claim is without merit.

## II. Tennessee Rule of Evidence 404(b) Evidence

The petitioner argues that trial counsel was ineffective by not objecting to certain testimony of trial witnesses Officer Timothy Barnes, Kimberly White, and the victim or filing a Rule 404(b) motion to exclude it.

In the direct appeal of the petitioner's kidnapping of the victim, the evidence showed that he had been with her and Kimberly White, her companion, three days earlier at a gas station, threatened them with a pistol, and refused to allow them to leave his vehicle. He then ordered the victim out of the car, and she went inside the office to telephone the police because she was afraid. The petitioner came in and told her, "It's fixing to end." Officers arrested him at that location after finding a loaded nine-millimeter handgun under the seat of the car. The petitioner's claim, in his post-conviction petition, was that Tennessee Rules of Evidence 401 and 404(b) do not allow the introduction of such evidence. As to this claim, the post-conviction court concluded that a "reasonably prudent attorney would have requested a 404(b) hearing," but that the petitioner had failed to show that such a hearing would have resulted in the exclusion of the evidence. Additionally, the State argues, in this regard, that in State v. Gilliland, 22 S.W.3d 266, 272, 277 (Tenn. 2000), our supreme court concluded that "contextual background evidence" may be admitted to avoid a "chronological or conceptual void in

the presentation of the case." In the direct appeal of this matter, we explained the strength of the State's case against the petitioner:

> Viewed in the light most favorable to the State, the proof at trial shows that the victim called the police from a gas station three days before the offense because the defendant had a gun and she was afraid of him. When the defendant was released from jail, he began following the victim and calling her repeatedly, which made the victim feel "uncomfortable" and "scared." On November 7, 2002, the victim rode in Love's car with the defendant, who at one point told Love, "I'm fixing to kill this bitch" and bragged about firing a gun into the home of an ex-girlfriend. The victim asked to be let out of the car but was not. When the victim and the defendant arrived at the defendant's father's apartment, the victim left her cell phone and purse in Love's car because she was scared. At the apartment, the victim told the defendant she intended to leave, but the defendant instructed her not to open the door.

Torian Dillard, 2008 WL 3342952, at *12.

In the direct appeal of the petitioner's conviction, we noted that the petitioner had been convicted of aggravated kidnapping by the "knowing, unlawful confinement of the victim so as to interfere substantially with her liberty, with the intent to terrorize her." Id.

We agree with the post-conviction court that, while trial counsel should have filed a Rule 404(b) motion to try and exclude this evidence, the petitioner failed to show that such a motion would have been successful. In fact, given the State had to show that the petitioner acted with the "intent to terrorize" the victim, it seems unlikely that this evidence would have been excluded. Accordingly, we conclude that the petitioner failed to establish that he was prejudiced by the fact that trial counsel did not file a Rule 404(b) motion to attempt to exclude this evidence.

### III. Victim's Seating Arrangement at Trial

The petitioner argues that it was improper for the trial court to permit the victim to testify while sitting in a chair, on the floor, in front of the jury. He argues that the trial court abused its discretion because this seating arrangement prevented the petitioner from seeing the victim's facial expressions and demeanor during her testimony. In his view, the positioning of the victim left the jury with the impression that he was a danger from whom the victim needed protection. Further, he asserts that the seating arrangement denied him his rights to confrontation of witnesses, due process of law, and a fair trial. In the petitioner's view, trial counsel was ineffective because he did not argue both that the

11

seating of the victim violated the petitioner's rights to confront the witness and his right to a fair trial.

During the trial, the court explained the reasons for allowing the witness to sit in front of the jury:

> And we're doing it because we're trying to get the voice amplified despite my repeated requests to get the voice amplified we couldn't do it and also apparently the witness seems more comfortable and we're trying to make her comfortable some way and at least we can get some testimony. You're welcome to add anything else.

On direct appeal, this court concluded that the placement of the witness was within the discretionary authority of the trial court:

> The defendant has cited no authority for the claim that it was an abuse of discretion to allow the victim to testify outside of the witness stand. The record reflects that the trial court and counsel for the State repeatedly asked the victim to speak more loudly during her testimony. At the defendant's motion for new trial hearing, the trial court stated that it made the decision to move the victim because the court was "very, very frustrated" that her voice was so soft and wanted to make sure the jury could hear her testimony. As we have set out, trial courts are afforded broad discretion in controlling the conduct of a trial. The record does not support the defendant's claim that the trial court abused its discretion in the seating of the witness.

Id. at *8.

As to a plain error review of the seating arrangement of the victim and the petitioner, this court concluded that it could not do so because the record on appeal was insufficient to clearly establish what had occurred in the trial court:

> Although the record reflects that the victim testified in a chair on the floor, facing the jury, the record does not disclose where the defendant was seated in relation to the victim. Therefore, we cannot determine whether, as the defendant claims, he could not see the victim's eyes while she testified. Moreover, the record does not reflect that the defendant requested to be repositioned so he could see the victim's face. Because the defendant has not clearly established that he was not "face to face" with the victim, our analysis need go no further.

12

Id. at *9.

Accordingly, the complaints regarding the trial seating of the victim, made in the petition for post-conviction relief, were determined adversely to the petitioner in the direct appeal of this conviction. He may not relitigate them.

Additionally, both on direct appeal and in this post-conviction proceeding, the petitioner argued that the seating arrangement of the victim violated his right to confrontation. In the direct appeal, this court declined to consider this claim as plain error, a constitutional claim as to the seating not having been made at trial, because the petitioner had not clearly established that he was not "face to face with the victim." Id. In this current proceeding, he argues trial counsel was ineffective because he failed to clearly establish the seating arrangement of the petitioner with respect to that of the victim. The problem with this argument is that the seating arrangement still is not clearly established, meaning that the petitioner cannot show that it prejudiced him. Thus, we conclude that this argument is without merit.

## IV. Jury Selection

The petitioner argues that trial counsel was ineffective because he did not pass on to the trial court the petitioner's reason for wanting to strike a prospective juror, who was white. However, our review of the trial transcript does not support this claim of his post-conviction petition.

This matter first arose during the petitioner's trial, when the State noted that "five of the six jurors that [defense counsel] submitted in his peremptory challenges in the first round were white." Questioned about the same juror, number six, whose remaining on the jury is the basis for this issue in the post-conviction petition, defense counsel explained:

> Your Honor, in response to juror number six, which is . . ., basically Your Honor, my main – my only reason is that my client simply – he just didn't want this particular person sitting on the jury. It wasn't anything – it was just from the moment [the juror] took the jury box, he just told me right away, I do not want this person on my jury."

Following lengthy arguments regarding the jurors the petitioner was trying to excuse from the jury, the court explained, "Well, I've already decided I'm not going to allow the excusing of [juror six]. I'm going to let him stay on the jury. I don't think that we've been given any race neutral reason with regard to [juror six]."

13

In the amended motion for new trial regarding prospective juror six, the petitioner argued that the trial court had erred in allowing the juror to remain on the jury after the petitioner had sought to strike him, based in part because "Defendant Torian Dillard did not like [juror six's] demeanor and body language." During his testimony at the evidentiary hearing on his post-conviction petition, the petitioner said that juror six had been looking at him and "frowning"; so the petitioner told trial counsel of this observation and that he wanted juror six to be excused from the jury.

Trial counsel was not asked during the hearing if the petitioner had given this reason for wanting to excuse the juror or whether, as trial counsel told the court at the trial that the petitioner simply "didn't want this particular person sitting on the jury." Regarding this matter, the post-conviction court concluded that the petitioner had failed to show that, even if the trial court had been advised that the prospective juror had been "frowning" at the petitioner, the petitioner "has failed to prove that a different outcome would have occurred." In other words, even if trial counsel rendered deficient performance, the petitioner failed to prove he was thereby prejudiced. We agree that the petitioner failed to meet his burden. Accordingly, this assignment is without merit.

Since we have determined the petitioner failed to show that he was prejudiced by any of the alleged trial errors of counsel, we conclude, as well, that, considering them collectively, he still has failed to establish prejudice.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the order of the post-conviction court denying relief to the petitioner.

_____
THOMAS T. WOODALL, PRESIDING JUDGE

14